UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MICHAEL W. HOLLIDAY**<br><br>**Plaintiff,**<br><br>v.<br><br>**SHERIFF MARLIN N. GUSMAN**<br><br>**Defendants.** | **CIVIL NO.: 2:19-CV-11236** |

## COMPLAINT

Plaintiff Michael W. Holliday states his causes of action against Orleans Parish Sheriff Marlin N. Gusman, solely in his official capacity, as follows:

### THE PARTIES

1. Plaintiff is Michael W. Holliday, a person of age and majority, a former Lieutenant of the Orleans Parish Sheriff's Office, and a Louisiana citizen residing in Orleans Parish.

2. Defendant is Sheriff Marlin N. Gusman, solely in his official capacity, a person of age and majority, the elected Sheriff of Orleans Parish, and a Louisiana citizen residing in Orleans Parish.

### JURISDICTION AND VENUE

3. The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 12101 *et seq*. (the Americans with Disabilities Act as amended).

4. The Court has personal jurisdiction over Sheriff Gusman because he is present within Louisiana at the time this litigation commenced.

5. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) (Title VII's venue provision) and 42 U.S.C. § 12117 (incorporating Title VII's venue provision in ADA cases) because (1) the unlawful employment practice alleged herein was committed in this judicial district (specifically, Orleans Parish); (2) alternatively, upon information and belief, the employment

1

records relevant to this action are found in this judicial district (specifically, Orleans Parish); and (3) alternatively, but for the unlawful employment practice, Mr. Holliday would have been employed in this district (specifically, Orleans Parish).

## PROCEDURAL AND STATUTORY REQUIREMENTS

6. At all relevant times, upon information and belief, OPSO employed more than 500 full-time employees.

7. On or about August 29, 2010, OPSO hired Mr. Holliday as a deputy recruit.

8. On or about May 30, 2018, OPSO terminated Mr. Holliday's employment.

9. On October 25, 2018, within 180 days from the date of his termination, Mr. Holliday timely filed his Charge of Discrimination with the New Orleans Field Office of the EEOC alleging that his termination was motivated by unlawful discrimination based on his disability and in retaliation for previously engaging in protected activity under the Americans with Disabilities Act (as amended) (EEOC Charge No. 461-2018-02964)

10. The EEOC issued its Notice of Right to Sue letter to Mr. Holliday on March 20, 2019.

11. Mr. Holliday timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.   The Plaintiff – former Lieutenant Michael Holliday**

12. Michael Holliday is a Louisiana native who lives in Covington, Louisiana.

13. Mr. Holliday was employed with the Orleans Parish Sheriff's Office beginning in August 2010.

14. Through his hard work and excellence, Mr. Holliday was eventually promoted to the rank of Lieutenant who managed the OPSO Classification Division, and, later, served as assistant to the

OPSO Chief of Corrections.

15.     Previous to his employment with OPSO, Mr. Holliday served in the United States Marine Corps from approximately 1998 until 2004.

16.     During his active duty service, Mr. Holliday fought in Iraq as part of Operation Iraqi Freedom.

17.     Mr. Holliday was honorably discharged from the United States Marine Corps in July 2004.

18.     The United States Department of Veteran Affairs subsequently diagnosed Mr. Holliday with Post-Traumatic Stress Disorder and tinnitus.

19.     The Department of Veteran Affairs made a specific finding that Mr. Holliday's diagnosis of PTSD was a 70% service-connected disability.

20.     Currently, Mr. Holliday receives federal veteran disability payment because of his service-connected disability.

21.     Mr. Holliday's PTSD typically manifests itself as episodic bouts of depression, anxiety, irritability, sleeplessness, and nightmares.

22.     When these episodes manifest, Mr. Holliday's disability constitutes both physical and mental impairments that substantially limit his ability to engage in major life activities, such as sleeping, communicating with others, interacting with others, and concentrating.

23.     Additionally, since Mr. Holliday was honorably discharged from the United States Marine Corps, his PTSD has also manifested itself three times as a loss of orientation to time and place, an inability to remember contemporaneous events, and a mild mental and physical stupor, usually in the context of a mental flashback to Mr. Holliday's prior military service (which, for the remainder of this complaint, is referred to simply as a "flashback episode").

24.     Mr. Holliday emerges from the flashback episode either naturally or when another person

helps Mr. Holliday orient to time and place.

25. Mr. Holliday experienced two of these three flashback episodes approximately sometime between 2007 and 2013.

26. Mr. Holliday experienced the most recent flashback episode on December 26, 2017 while asleep at his former home in Metairie.

27. These flashback episodes have only occurred at night, after Mr. Holliday has fallen asleep, and only after Mr. Holliday has experienced extreme, personal stress in his life.

28. These flashback episodes have never occurred during the daytime, or while Mr. Holliday is awake, or while Mr. Holliday was at work.

29. Based on an individualized assessment of his own disability and impairment, it seems impossible for Mr. Holliday to suffer a flashback episode while awake or at work.

30. In any event, Mr. Holliday has never injured himself or anyone else during one of these flashback episodes.

31. Mr. Hollilday, who owns firearms at his residence, never attempted to retrieve or wield any firearm during a flashback episode.

32. Mr. Holliday has never posed a significant risk to the health or safety of himself or others during a flashback episode.

33. Based on an individualized assessment of his own disability and impairments, it seems very unlikely that Mr. Holliday could ever pose a significant risk to the health or safety of himself or others during a flashback episode.

34. Based on an individualized assessment of his own disability and impairments, it may be the case that Mr. Holliday may never suffer another flashback episode again.

35. While employed by OPSO, Mr. Holliday served his entire career without ever once

suffering a flashback episode of PTSD while on duty.

36. While employed by OPSO, Mr. Holliday served his entire career without ever once suffering a flashback episode of PTSD during the day or otherwise while awake.

37. Based on an individualized assessment of Mr. Holliday's specific disability and impairments, there appears no chance that Mr. Holliday would ever suffer a flashback episode in the workplace.

38. Alternatively, based on an individualized assessment of Mr. Holliday's specific disability and impairments, to the extent there is any chance whatsoever that Mr. Holliday would suffer a flashback episode in the workplace, that chance could be completely mitigated through reasonable accommodation, such as by allowing Mr. Holliday to use short periods of FMLA or sick leave during any future period of extreme, personal stress (which is already allowed under law), or by simply educating a fellow OPSO team member on the appropriate way to help Mr. Holliday emerge from a flashback episode by orienting him to time and place.

39. Ultimately, based on an individualized assessment of his disability and impairments, nothing about Mr. Holliday's PTSD, including any of his episodic symptoms or flashback episode, poses a significant risk to the health or safety of himself or others at all.

40. At all times during his employment with OPSO, Mr. Holliday was able to perform all essential functions of his job without the need for reasonable accommodation of his PTSD disability or associated impairments.

41. Finally, in 2017, Mr. Holliday voluntarily took part in the OPSO Employee Assistance Program based on his own personal concern regarding his PTSD symptoms and certain potential PTSD-related substance abuse behavior, and Mr. Holliday began treating with a physician contracted with OPSO.

42. Mr. Holliday successfully treated with the OPSO physician, including treatment at an in-patient treatment facility specializing in treatment of veterans, and the OPSO contracted physician cleared Mr. Holliday to return to work with no restrictions.

43. At no time did Mr. Holliday pose any risk whatsoever to the health or safety of himself or others based on any issue connected to his PTSD or potential substance abuse behavior.

44. At all times, Mr. Holliday was able to perform all essential functions of his job regardless of any PTSD-related symptoms described herein.

**B.     The Defendant – Sheriff Marlin Gusman**

45. Sheriff Gusman is the duly elected sheriff of Orleans Parish.

46. Sheriff Gusman is the legal and in-fact employer of all people employed at the Orleans Parish Sheriff's Office.

47. Under Louisiana state law, Sheriff Gusman is the final decision-maker and policymaker for the office of the Orleans Parish Sheriff.

48. Sheriff Gusman's administration is organizationally structured as the Orleans Parish Sheriff's Office (OPSO).

49. At all relevant times in this lawsuit, Sheriff Gusman was either the final decision-maker with respect to all employment decisions within OPSO, including termination, or Sheriff Gusman had conferred that decision-making authority to any number of his employees or subordinates.

50. Alternatively, at all relevant times in this lawsuit, Sheriff Gusman, through his voluntary settlement in the *Jones et al v. Gusman et al.* matter and subsequent court-issuance of a "Stipulated Order" arising from that case, had vested his employment authority, including termination authority to Darnley Hodge, who served, at the time, as the "Interim Independent Jail Compliance Director."

51. In turn, at all relevant times to this lawsuit, Director Hodge had conferred decision-making authority over employment decisions, including termination, to any number of Sheriff Gusman's employees or subordinates.

C. **Mr. Holliday Suffers a Single Episode of PTSD While Off Duty**

52. On the evening of December 26, 2017, Mr. Holliday was alone at his home in Metairie.

53. Mr. Holliday had recently experienced a uniquely upsetting and stressful time in his personal life.

54. Ultimately, Mr. Holliday suffered an episode of PTSD that evening after Mr. Holliday fell asleep.

55. The episode manifested itself as a temporary loss of memory and disorientation.

56. Mr. Holliday, confused as to time and place, and in a slight stupor, took a plastic baggie and knife from his kitchen and wandered around and eventually outside his home.

57. Eventually, Mr. Holliday wandered into the backyard of his neighbor.

58. The neighbor summoned the Jefferson Parish Sheriff's Office, and deputies eventually arrived to the scene.

59. As deputies approached Mr. Holliday, he immediately released the plastic baggie and knife and did not resist them at all.

60. Deputies placed Mr. Holliday under arrest and relocated him to the Jefferson Parish Jail.

61. At no time during the incident did Mr. Holliday become violent or threatening in any way.

62. At no time during the incident did Mr. Holliday possess any firearm.

63. At no time during the incident did Mr. Holliday resist the lawful instructions of JPSO deputies.

64. At no time was Mr. Holliday a physical threat to anyone, including himself.

65. While at the jail, Mr. Holliday regained full awareness of his surroundings, time, and place.

66. Shortly after his release, Mr. Holliday contacted OPSO and alerted them to his arrest.

**D.   OPSO Convenes a Disciplinary Hearing and Recommends Terminating Mr. Holliday Because of His Disability**

67. Decision-makers at OPSO suspended Mr. Holliday pending investigation Mr. Holliday informed them of his arrest on December 26, 2018.

68. Subsequently, the Jefferson Parish District Attorney's Office refused any criminal charges against Mr. Holliday based on the events of December 26, 2018, and Mr. Holliday alerted OPSO decision-makers to this fact.

69. On May 25, 2018, OPSO convened a disciplinary hearing to determine whether Mr. Holliday engaged in any misconduct related to the events of December 26, 2018.

70. The disciplinary hearing consisted of four OPSO high-ranking officers, Major Ruiz, Major Louque, Major Barre, and Chief Magee.

71. Mr. Holliday was present during the presentation of evidence and was extensively questioned by the committee members, and was given the opportunity to make a statement in his defense.

72. In reality, the entire hearing centered exclusively on Mr. Holliday's PTSD disability, and committee members wondered aloud about whether Mr. Holliday should be a law enforcement officer despite his honorable discharge from the United States Marine Corps, unblemished service record with OPSO, and zero apparent risk of his PTSD symptoms or related impairments effective his ability to perform his essential job duties.

73. When given the opportunity, Mr. Holliday assured the hearing officers that he did not present a safety risk to himself or others, and he explained that his flashback episode was an extraordinarily rare occurrence that had never occurred during the daytime, work, or while he was

8

awake.

74. Also, committee members wondered aloud whether Mr. Holliday should be allowed to continue working given that he had previously availed himself of OPSO's voluntary Employee Assistance Program (that, per OPSO policy, the details of which should have been confidential and not used against Mr. Holliday).

75. At no point did the hearing members question or discuss whether Mr. Holliday had acted unprofessionally or actually violated any law.

76. At no point did the hearing members attempt to determine whether there was any reasonable, medical basis to believe that Mr. Holliday's PTSD disability and related symptoms posed a direct threat to the safety of himself or otherwise in terms of his employment with OPSO.

77. After the hearing concluded, the committee members determined that Mr. Holliday's PTSD-related illness on December 26, 2018 constituted a violation of OPSO policy article #201 ("Adherence to Law").

78. After the hearing concluded, the committee members determined that Mr. Holliday's PTSD-related illness on December 26, 2018 constituted a violation of OPSO policy article #301 ("Professionalism").

79. Based on the recommendation and findings of the hearing committee, Sheriff Gusman, or Compliance Director Darnley Hodge, or a designee of either, terminated Mr. Holliday's employment.

80. Upon information and belief, the determination and findings of the hearing committee and, later, Sheriff Gusman, Director Hodge, or their designee, that Mr. Holliday violated the law or acted unprofessionally when he became ill on the evening of December 26, 2018 was mere pretext.

81. In reality, upon information and belief, the hearing committee voted to recommend

terminating Mr. Holliday's employment because Mr. Holliday is disabled, and the members did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

82. In the alternative, upon information and belief, the hearing committee voted to recommend terminating Mr. Holliday's employment because Mr. Holliday has a record of disability, and the hearing members did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

83. In the alternative, upon information and belief, the hearing committee voted to recommend terminating Mr. Holliday's employment because the hearing members regarded Mr. Holliday as disabled, and the hearing members did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

84. In reality, upon information and belief, Sheriff Gusman, Director Hodge, or their designee terminated Mr. Holliday's employment because Mr. Holliday is disabled, and Sheriff Gusman, Director Hodge, or their designee did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

85. In the alternative, upon information and belief, Sheriff Gusman, Director Hodge, or their designee terminated Mr. Holliday's employment because Mr. Holliday has a record of disability, and Sheriff Gusman, Director Hodge, or their designee did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

86. In the alternative, upon information and belief, Sheriff Gusman, Director Hodge, or their designee terminated Mr. Holliday's employment because they regarded Mr. Holliday as disabled, and Sheriff Gusman, Director Hodge, or their designee did not want a disabled veteran who had been diagnosed with PTSD working for Sheriff Gusman or at OPSO.

87. In reality, upon information and belief, neither the committee members nor Sheriff Gusman, Director Hodge, or their designee actually believed that Mr. Holliday posed a direct threat to the safety or health of himself or otherwise in the workplace.

88. In the alternative, any belief of the committee members or Sheriff Gusman, Director Hodge, or their designee that Mr. Holliday posed a direct threat to himself or others in the workplace was per se unreasonable, formed without individualized assessment of Mr. Holliday's disability and impairments, formed without any medical guidance or input whatsoever, and was factually wrong.

89. Upon information and belief, at no time did OPSO have a blanket policy or qualification standard that excluded from employment employees who had been diagnosed with PTSD.

90. Upon information and belief, even if OPSO had such a policy or qualification standard, that policy or standard could not be reasonably justified as an organizational necessity.

91. Alternatively, the recommendation of committee members to terminate Mr. Holliday's employment, and the decision of Sheriff Gusman, Director Hodge, or their designee to terminate Mr. Holliday's employment, was in retaliation for Mr. Holliday previously enrolling in OPSO's voluntary substance-abuse assistance program.

92. Finally, pursuant to OPSO policy, Mr. Holliday timely appealed his termination decision requesting re-hire and reinstatement.

93. On or about November 8, 2018, Director Hodge denied Mr. Holliday's appeal and his request for re-hire and reinstatement.

E. **The Aftermath: Mr. Holliday's Career Is Ruined**

94. When a member of the Louisiana law enforcement community is terminated for alleged cause, it is virtually impossible for the former officer to ever regain employment with any other

Louisiana law enforcement agency.

95. When any Louisiana law enforcement employer terminates an officer for alleged cause, that decision effectively destroys and permanently ends the former officer's career in law enforcement.

96. That is exactly the case here for Mr. Holliday.

97. Despite his diligent and continued efforts, Mr. Holliday has never found re-employment in any other law enforcement or security position since his unlawful termination from OPSO.

98. Despite his diligent and continued efforts, Mr. Holliday has never found re-employment anywhere at any job.

99. OPSO's unlawful termination decision has cost Mr. Holliday significant past lost wages and lost related income from off-duty details, including lost wages attendant to future, likely promotion to the position of Administrative Warden.

100. OPSO's unlawful termination decision will cost Mr. Holliday significant future lost wages, pension benefits, and lost related income from off-duty details, and including lost wages attendant to future, likely promotion to the position of Administrative Warden.

101. OPSO's unlawful termination decision has cost Mr. Holliday significant out-of-pocket expenses, including attorney's fees, and the loss of Mr. Holliday and his children's medical and dental insurance benefits.

102. OPSO's unlawful termination decision has caused Mr. Holliday extreme mental anguish, pain and suffering, and the loss of enjoyment of life.

103. OPSO's unlawful termination decision effectively ruined the career and completely upended the life of an honorably discharged veteran of the United States Marine Corps who served the United States of America in active combat duty in Iraq and has suffered with PTSD because

of it.

## CAUSES OF ACTION

**Disability Discrimination Under the Americans with Disabilities Act (as Amended)**

104. Pursuant to the Americans with Disabilities Act (as amended), an employer may not discriminate against an employee "on the basis of disability in regard to . . . [the] discharge of employees. . . ." 42 U.S.C. § 12112(a).

105. Relevant here, to make out a prima facie case of disability discrimination, a plaintiff must show "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014). "Disability" means that the plaintiff "is disabled, has a record of having a disability, or is regarded as disabled." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).

106. In the first instance, a plaintiff is "disabled" if he suffers from "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). Relevant here, an "impairment" is "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness[.]" 29 C.F.R. § 1630.2(h)(2). An impairment is substantially limiting when considering "the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities" include but are not limited to "concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). An impairment is substantially limiting even if it is episodic in nature or in remission, if when the impairment is present it would be substantially limiting. 29 C.F.R. § 1630.2(j)(1)(vii).

107. Alternatively, a plaintiff is disabled when he is "regarded as disabled." 42 U.S.C §

12102(1)(c). A person is "regarded as disabled" when he is "subjected to an action prohibited under the ADA because of 'an actual or perceived' impairment regardless of whether the impairment is, or is perceived to be, substantially limiting." *Kennedy v. Parkview Baptist Sch., Inc.*, 13-478, 2014 WL 7366256 at *6 (M.D. La. Dec. 24, 2014) (citing 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(l)(1)-(3)).

108. Regarding the health and safety of the employee and his co-workers, an employer is required to "make an 'individualized assessment of the individual's present ability to safely perform the essential function of the job.'" *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) (quoting *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)). Likewise, an "employer has an obligation to ensure that its applicants are treated as individuals," and therefore must assess the "reasonableness" of any conclusions regarding the employee's health, fitness, or possible threat. *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 484 (5th Cir. 2006).

109. Ultimately, an employer who discriminates against a disabled employee by terminating his employment is liable for the employee's resulting damages, including lost back wages, compensatory damages, statutory damages, litigation costs, and reasonable attorney's fees.

110. In this case, Mr. Holliday suffers from episodic symptoms of Post-Traumatic Stress Disorder that, when present, substantially impair his ability to perform major life functions including sleeping, concentrating, communicating, and interacting with others. Additionally, although very rarely, in fact only three times during his entire life, Mr. Holliday has awoken from sleeping at night in his home and was disoriented to time and place, suffering for a short time in a mild stupor, until he naturally emerged from the condition or was oriented to time and place by another person. But at no time during any such episodes did Mr. Holliday hurt himself or others;

at no time during any such episodes did Mr. Holliday post a threat, significant or not, to the health and safety of himself or others. Mr. Holliday never suffered any such flashback episodes at work, and based on his individualized assessment of his condition, it does not appear possible that Mr. Holliday could ever suffer such an episode while he was awake, during the day, or at work.

111. Instead, Mr. Holliday suffered a brief flashback episode on December 26, 2017. When he was approached by Jefferson Parish Sheriff's deputies, Mr. Holliday complied and did not resist arrest. Mr. Holliday later emerged from the episode and reported it and his arrest to appropriate personnel at OPSO. OPSO suspended Mr. Holliday pending an investigation, but upon information and belief no attempt was ever made to individually assess whether Mr. Holliday's impairments prevented him from performing the essential duties of his job, or if his impairment posed a direct threat to himself or others.

112. Instead, OPSO convened a disciplinary hearing during which the hearing members openly questioned whether Mr. Holliday should be allowed to remain an employee simply because he had previously been diagnosed with PTSD and had voluntarily enrolled in OPSO's Employment Assistance Program, despite the fact that Mr. Holliday was cleared to work by an OPSO contracted-physician after successfully completing the EAP. Further, OPSO during Mr. Holliday's suspension did not refer Mr. Holliday for any subsequent or further medical review or examination, psychological review or examination, or even a fitness for duty test.

113. Instead, upon information and belief, the committee members simply made the decision that they preferred to not work around a disabled veteran, and then, upon further information and belief, the committee members pretextually voted to sustain the administrative charges against Mr. Holliday without cause, and in direct contraindication from OPSO's own EAP-contracted physician who had previously cleared Mr. Holliday for work with no restrictions. The committee

members voted in this way despite having actual knowledge that the Jefferson Parish District Attorney's Office had already refused all criminal charges against Mr. Holliday (because, of course, becoming ill and disoriented is not a crime). Additionally or alternatively, the committee members regarded Mr. Holliday as disabled in some way because of his PTSD-related symptoms and impairments, or because he had previously participated in OPSO's voluntary, Employee Assistance Program. Additionally and alternatively, the committee members discriminated against Mr. Holliday based on his record of disability or participation in OPSO's EAP, or in retaliation for previously utilizing that particular accommodation.

114. Then, upon information and belief, Sheriff Gusman, Director Hodge, or their designee made the exact same determination to discriminate against Mr. Holliday based on his disability, his record of disability, or regarding him as having a disability, or in retaliation for previously utilizing OPSO's EAP program, and terminated Mr. Holliday's employment. Later, Director Hodge denied Mr. Holliday's timely appeal to be re-hired and re-instated.

115. The upshot is that OPSO decision-makers discriminated against Mr. Holliday because he is disabled, has a record of disability, or became regarded as disabled. OPSO decision-makers based their termination decision on unreasonable and unsupported beliefs about the nature of Mr. Holliday's impairments without regard to any medical science, psychological inquiry, or Mr. Holliday's actual fitness for duty. Then, to cover up their discrimination, OPSO decision-makers made a pretextual finding that Mr. Holliday violated administrative policy because he became ill and disoriented on December 26, 2018. These decisions, discrimination, and pretext culminated when Sheriff Gusman, Director Hodge, or their designee terminated Mr. Holliday's employment on May 30, 2018, and again when Director Hodge denied Mr. Holliday's timely appeal.

116. Accordingly, Sheriff Gusman, solely in his official capacity as Orleans Parish Sheriff, is

liable to Mr. Holliday for all statutory and equitable damages caused by his illegal employment discrimination, including lost back wages, lost future wages, compensatory damages, statutory damages, litigation costs, and reasonable attorney's fees.

## JURY TRIAL

Mr. Holliday requests a trial by jury on all issues and causes of action in this matter.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Michael W. Holliday prays that his complaint be deemed good and sufficient; that it and summons be served upon defendant Marlin N. Gusman and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant, for all damages and equitable relief due to plaintiff, including back pay, front pay or reinstatement, compensatory damages, non-compensatory damages, costs, reasonable attorney's fees, and legal interest from the date of demand, and for all other general and equitable relief required to make-whole the plaintiff to which he is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone: (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Michael Holliday*

**Clerk of Court: Please hold summons pending attempt to secure waiver of service.**