UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL W. HOLLIDAY                          CIVIL ACTION

VERSUS                                       NUMBER: 19-11236

MARLIN N. GUSMAN                             DIVISION (5)

ORDER AND REASONS

Before the Court are Plaintiff's Motion for Summary Judgment on Liability (rec. doc. 52) and Defendant's Motion for Summary Judgment.  (Rec. doc. 55).  Both motions are opposed, (rec. docs. 60 & 61), and both parties have filed replies.  (Rec. docs. 70 & 73).  For the following reasons, the Court grants Defendant's Motion for Summary Judgment (rec. doc. 55) and denies Plaintiff's Motion for Summary Judgment on Liability.  (Rec. doc. 55).

I.      Factual Background

Plaintiff Michael W. Holliday filed this lawsuit against Defendant Marlin N. Gusman, Sheriff of Orleans Parish ("OPSD"), alleging disparate-treatment discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Uniformed Service Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 3801 *et seq.*  Holliday alleges that he was suspended and then terminated from his employment at the Orleans Parish Sheriff's Office ("OPSO") because he suffers from post-traumatic stress syndrome ("PTSD") after serving in the United States Marine Corps.

Holliday served eight years in the Marine Corps and was honorably discharged in 2003.  (Rec. doc. 61-3 at p. 2).  He served one combat tour in Iraq and Kuwait in 2003.  (Rec. doc. 55-4 at p. 32).  Holliday was diagnosed with PTSD in the summer of 2017.  (*Id.* at p. 6).

On December 16, 2017, while employed by OPSO as a Lieutenant, Holliday's neighbor Nihaya Mansour – who had heard noises in her backyard at approximately 10:46

p.m. – observed Holliday there clad only in his black underwear and black socks.  (Rec. doc. 55-5 at p. 41).  Mansour's daughter, Rosaila Mansour, reported that Holliday was growling like a dog.  (*Id.*).  Nihaya yelled at Holliday to leave her backyard, and, when he did not, Rosaila informed him that she was calling the police.  (*Id.*).  Yet Holliday just stood there, holding a plastic bag and a black-handled stainless-steel pocketknife.  (*Id.*).  Holliday never threatened the Mansours, but Rosaila dialed 911.  (*Id.*).  Nihaya then noticed that the side housing panel to the window air conditioner was damaged.  (*Id.*).

When deputies from the Jefferson Parish Sheriff's Office ("JPSO") arrived, they observed Holliday in his underwear and socks, and Holliday dropped the pocketknife.  (*Id.*).  The police detained him, and Nihaya reported to them that she wanted to press criminal charges.  (*Id.*).  The police arrested Holliday and later booked him on charges of criminal trespassing and simple criminal damage.  (*Id.* at p. 44).  Holliday believes that this incident occurred due to his PTSD, but he admitted at his deposition that no medical provider had ever indicated that PTSD caused the episode.  (Rec. doc. 55-4 at p. 56).

On December 27, 2017, the OPSO notified Holliday that it was suspending him "in connection with an allegation that [he] acted in a manner unbecoming" of an OPSO employee in violation of OPSO Rule 201 – Adherence to Law, and Rule 301 – Professionalism.  (Rec. doc. 55-6 at pp. 1, 7).[1]  After Holliday requested a stay of the

---

[1] Rule 201 – Adherence to Law – states, "Employees of the [OPSO] shall act in accordance with the constitutions of the United States and the State of Louisiana and obey all statutes, ordinances and administrative regulations of the State of Louisiana, Orleans Parish, and the City of New Orleans.  When in another jurisdiction, employees shall obey the applicable laws in that jurisdiction.  Ignorance of the law or its interpretations will not be regarded as a valid defense against the requirements of this rule.  A finding of guilt for any of the following offenses may result in disciplinary action, up to and including termination from employment."

Rule 301 – Professionalism – states, "On or off-duty employees shall conduct themselves professionally with the utmost concern for the dignity of any individual with whom they are interacting.

proceedings, the OPSO granted a stay of all administrative proceedings related to his suspension while he sought treatment for PTSD.  (*Id.* at p. 2).  The OPSO notified him that the "stay of current administrative proceedings has no bearing upon any future administrative proceedings of the ultimate determination of [his] status with the OPSO and that he was required to contact the OPSO once he finished his treatment program."  (*Id.* at p. 61).

Holliday's disciplinary proceeding resumed on April 23, 2018 after he notified Lieutenant John Morreale, the Administrative Commander of the OPSO's Internal Affairs Division ("IAD"), that the criminal charges against him had been refused.  (*Id.* at p. 2).  On April 27, 2018, IAD Agent Kevin Talley and Morreale interviewed Holliday.  (*Id.* at p. 3).  Holliday informed Talley and Morreale that he had no memory of the incident that led to his arrest, but he again opined that the incident was caused by his PTSD.  (*Id.*).  Holliday reported that he had not had an episode of PTSD in approximately seven years.  (*Id.*).

Holliday produced a letter to the IAD from the Department of Veterans Affairs ("VA") dated October 4, 2017, described as a "summary of benefits" and indicating that Holliday has "one or more service-connected disabilities."  (*Id.*).  Neither this letter nor the other records from the VA suggested that PTSD caused Holliday's December 26, 2017 arrest.  (*Id.*).  Indeed, Holliday produced no medical records or other documentation that indicated that PTSD caused his arrest.  (*Id.* at p. 4).  Holliday testified at his deposition that neither Morreale nor Talley made him feel as if they did not want him working at the OPSO because of his PTSD.  (Rec. doc. 55-4 at p. 57).

---

Employees shall not demean or unnecessarily inconvenience any individual and shall not act in a manner that discredits the employee or the [OPSO]."  (Rec. doc. 55-6 at pp. 1-2).

Based on their investigative findings, the IAD sustained the administrative charges against Holliday.  (Rec. doc. 55-6 at p. 4).  Pursuant to OPSO's Employee Disciplinary Policy, any employee accused of a criminal act receives a hearing before OPSO's Disciplinary Review Board ("DRB").  (*Id.*).  On May 25, 2018, the DRB held a disciplinary hearing to determine whether Holliday violated Articles 201 and 301 of the OPSO Rules and Regulations and any potential penalty.  (*Id.* at p. 5).  During the hearing, Holliday testified as to his PTSD and his opinion that PTSD caused his arrest but presented no evidence – other than his own opinion – that his PTSD caused his arrest.  (Rec. doc. 55-5 at pp. 29-37).  Holliday testified at his deposition that "there were no statements or insinuations [at the DRB hearing] that [he] should not work there [OPSO] at all."  (Rec. doc. 55-4 at p. 57).  The DRB ultimately voted to sustain the charges against Holliday and recommended termination based on the members' conclusion that Holliday's conduct violated the law and OPSO's standard regarding professionalism.  (Rec. doc. 55-8 at p. 2).  Tellingly, all members of the DRB who presided over Holliday's hearing had served during other DRB hearings when they had recommended termination for other employees for adherence to law and professionalism violations when the employees did not have known PTSD or earlier military service.  (*See, e.g., id.*).

Compliance Director Darnley R. Hodge, Sr. – who at the time had the final authority to discipline and terminate OPSO employees – approved Holliday's termination and declared that he did not consider Holliday's PTSD or military service when doing so.  (Rec. doc. 55-3 at pp. 1-2).  The OPSO terminated Holliday on May 30, 2018.  (Rec. doc. 42 at ¶ 10).  Holliday appealed his termination.  (*Id.* at pp. 5-6).  Hodge denied that appeal.  (*Id.* at p. 7).  Holliday testified that he did not believe that Hodge terminated or denied his appeal

due to his PTSD or his military service because Hodge himself was a "combat veteran." (Rec. doc. 55-4 at pp. 249-252).  In all, since January 1, 2017, OPSO has terminated 13 employees other than Holliday based on their own arrests.  (Rec. doc. 55-6 at pp. 5-6).

On June 16, 2019, Holliday filed this lawsuit against Gusman, alleging disability discrimination under the ADA.  (Rec. doc. 1).  Holliday later amended his complaint to add the claims under USERRA.  (Rec. doc. 40, 42).

## II.    Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).   "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."   *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.   "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.  The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution.  *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  (quoting *Celotex*, 477 U.S. at 322 (emphasis added)).

### III.   Law and Analysis

### A.   The ADA

The ADA was enacted by Congress "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities".   42 U.S.C. § 12101(b); *United States v. Morvant*, 843 F. Supp. 1092, 1094 (E.D. La. 1994).   First, the employee must establish a *prima facie* case by showing that:  (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees without a disability were treated more favorably.   *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).   If the employee establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action.   *Dickerson v. Bd. Of Trustees of Community Coll. Dist. No. 522*, 657 F.3d 595, 601(7th Cir. 2011) (citing *Rooney v. Koch Air, L.L.C.*, 410 F.3d 376, 381 (7th Cir. 2005)).   The employer's burden in that regard is one of production, not persuasion; the burden of persuasion remains with the employee throughout the process.   *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751–52 (7th Cir. 2007).   Finally, if a legitimate reason is produced, the employee must prove by a preponderance of the evidence that the employer's stated reason is a lie.   *Dickerson*, 657 F.3d at 601; *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) ("Pretext means a dishonest explanation, a lie rather than an oddity or an error.") (internal quotation marks omitted); *see Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014).

The Court will assume – and the OPSO acknowledges – that PTSD is a medical impairment for purposes of the ADA.  Yet merely having an impairment does not make one disabled for purposes of the ADA.  Claimants also need to demonstrate that the impairment

substantially limits a major life activity.  *See* 42 U.S.C. § 12102(2)(A); *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 147, 150 (5th Cir. 1998); *Deas v. River W., L.P.*, 152 F.3d 471, 475 (5th Cir. 1998):

> One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment. *Bridges*, 92 F.3d at 332.

*Id.*  As it is uncontested that PTSD constitutes an impairment, this case involves the first of the three scenarios outlined above (*i.e.*, when an individual has an impairment that the employer allegedly perceives as substantially limiting).  *Id.* at 476.  "[M]ajor life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, [and] walking."  *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 446 (5th Cir. 2018) (quoting 42 U.S.C. § 12102(2)(A)).  The EEOC has cautioned:  "'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "An impairment need not prevent, or significantly or severely restrict" performance of major life activities, but rather, the standard is whether it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id.* § 1630.2(j)(1)(ii); *Williams*, 717 F. App'x at 446.

    The OPSO argues that Holliday cannot establish a *prima facie* case under the ADA because he was not disabled at the time of his termination.  The exhibits attached to the parties' pleadings reveal that Holliday testified at his deposition that his PTSD does not substantially impact his day-to-day life, nor did it impact his ability to perform his job duties at the OPSO.  (Rec. doc. 55-4 at p. 52).  Holliday also testified, however, that his PTSD

has manifested during his sleep at least three times during the last 10 years, including the incident leading to his arrest.  (*Id.*; rec. doc. 52-1 at p. 5)).

In any event, Holliday has produced no evidence that any doctor or therapist has ever indicated that his arrest was attributable to his PTSD.  (Rec. doc. 55-4 at p. 56).[2] Neither has any doctor or therapist ever indicated that his PTSD caused the two earlier episodes, (rec. doc. 42 at ¶ 29), as Holliday has testified that no one diagnosed him with PTSD until 2017.  (Rec. doc. 55-4 at p. 6).  Moreover, Holliday's own admission that his disability has no impact on his day-to-day life negates any conclusory assertion made by him that he was substantially limited by his disability in any major life activity.  *See Gaines v. Techline, Inc.*, No. 1:13-CV-00576, 2017 WL 1194234 at *5 (W.D. La. Mar. 29, 2017) ("[The plaintiff's] diagnoses of PTSD and the depression, regardless of treatment, do not constitute a disability.  By [the plaintiff's] own admission, he was not substantially limited in any major life activities . . . ."); *Preston v. Victoria Indep. Sch. Dist.*, No. Civ. A. V-09-20, 2010 WL 2735729 at *9 (S.D. Tex. July 12, 2010) (finding that plaintiff's own allegations that she was substantially limited in her ability to care for herself, interact with others, think, or perform manual tasks were insufficient to raise a genuine issue of material fact as to whether her PTSD substantially impaired any major life activity, when her testimony indicated that she can drive, dress herself, and clean her house).  That Holliday has

---

[2] While Holliday submits the testimony of the doctors at the VA who all diagnosed him with PTSD and ADHD, this evidence does not prove that Holliday's PTSD *caused* the episode that led to his arrest.  (Rec. doc. 70 at pp. 1-3).  In any event, the case law demonstrates that an employer can validly terminate an employee for violating an employer's policy, even when the violation was caused by a disability.  *See Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (finding that a plaintiff's verbal and physical abuse of a co-worker in violation of workplace violence policy, whether or not it was caused by plaintiff's PTSD, constituted a legitimate and non-discriminatory reason for his termination); *Roberson v. Iberia Comprehensive Cmty. Health Ctr., Inc.*, No. 6:19-CV-00067, 2020 WL 1930467 at *10 (W.D. La. Apr. 21, 2020) (determining that plaintiff's manic bipolar disorder did not excuse her sending of vulgar text messages to co-employees, which violated the company's conduct and discipline policies).

allegedly received treatment from the VA for his PTSD does not necessarily mean that he is disabled under the ADA – especially considering his own admissions under oath that his PTSD did not have any impact on his ability to engage in normal living activities or his work. *Gaines v. Techline, Inc.*, No 1:13-CV-00576, 2017 WL 1194234 (W.D. La. Mar. 29, 2017).

Holliday only testified that during these episodes, he becomes unaware of his surroundings, yells, acts like he is hiding from someone, loses awareness, and becomes disoriented. (Rec. doc. 52-14 at pp. 208-12). Yet even were the Court to conclude that these three episodes over the past 10 years were caused by his PTSD, the Fifth Circuit has "decline[d] to accept the broad proposition that every temporary loss of "awareness," no matter how brief, necessarily constitutes a substantial limitation of the major life activities of seeing, hearing, and speaking." *Deas*, 152 F.3d at 479; *Williams v. City of Pilot Point*, No. 4:04-CV-294, 2006 WL 8441454 at *6 (E.D. Tex. Mar. 21, 2006) (finding that evidence that a plaintiff is "unconscious and unable to walk, talk, work, or physically manipulate items" during an episode is irrelevant; the plaintiff must proffer evidence that the impairment was substantially limiting during the times in which the individual was not having an episode, or even shortly after having an episode); *see also Barnes v. N. Miss. Med. Ctr., Inc.*, No. 1:19-CV-7-DAS, 2020 WL 3472917 at *5 (N.D. Miss. June 25, 2020) (holding that the plaintiff's episodic bouts of anxiety and/or PTSD during which her hands shook and became sweaty were insufficient to show that the plaintiff's disability substantially limited a major life activity). Indeed, an episodic disability that is "sporadic" and not shown to occur with any "frequen[cy]" indicates that the impairment does not affect any major life activities. *Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 862 (S.D. Tex. 2008). As this

10

Court earlier noted, Holliday's PTSD has only manifested itself three times in the past 10 years.

Citing the 2008 Amendments to the Code of Federal Regulations, particularly revised 29 C.F.R. § 1630.2(j)(1)(vii), Holliday argues that a sporadic manifestation of disability can qualify as a disability under the ADA. That regulation provides, "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). Defendant counters by arguing that a rare and episodic manifestation is relevant as to whether Holliday is disabled under the ADA, even after the 2008 amendments to the statute. At least one court in this district has rejected Holliday's argument. In *Moore v. Centralized Management Servs., L.L.C.*, the plaintiff argued that his alcoholism substantially limited a major life activity. No. CV 19-1592, 2020 WL 972711 (E.D. La. Feb. 28, 2020), *reconsideration denied*, No. CV 19-1592, 2020 WL 2037191 (E.D. La. Apr. 28, 2020). However, the court held that plaintiff's "relapse, after being in recovery for years, is more akin to an 'occasional manifestation' of his disease" that did not "constitute a substantially limiting impairment under the ADA." *Id.* at *5. As the court explained, "[t]o 'hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds.'" *Id.* at *4 (internal quotation omitted). Also relevant here, the court noted that "[n]o medical professional provided testimony that [the plaintiff] has been substantially limited in a major life activity," and granted summary judgment in defendant's favor. *Id.*; *see also Barnes v. N. Miss. Med. Ctr., Inc.*, No. 1:19-CV-7-DAS, 2020 WL 3472917 at *5 (N.D. Miss. June 25, 2020) (holding that plaintiff failed to show that her

PTSD/anxiety substantially limited a major life activity and granting summary judgment for defendant where plaintiff "testified that her anxiety is episodic").

Holliday argues that even should the Court determine that he is not disabled, the OPSO's other employees "regarded" him as disabled due to his PTSD – which still constitutes a violation of the ADA. *See Deas*, 152 F.3d at 475.  The Court finds that the evidence in the record does not support this statement.  Holliday alleges that "Mr. [Blake] Arcuri [counsel for the OPSO] clearly regarded Mr. Holliday as disabled because he unilaterally paused all disciplinary proceedings against Mr. Holliday until he completed a behavioral treatment course for his PTSD shortly after his initial suspension in this matter." (Rec. doc. 61 at pp. 16-17.)   However, Holliday's own evidence belies this allegation. Specifically, Holliday submitted into evidence an email from Mary Livers sent to Blake Arcuri and others on January 2, 2018, which clearly indicates that Holliday informed the OPSO of his PTSD and his need for treatment; not that OPSO officials "unilaterally" decided that he needed treatment.  (Rec. doc. 52-12).  Holliday's allegation regarding Arcuri's perception of him is thus based entirely on what he himself reported to the OPSO.

Holliday also argues that Talley – who interviewed him – regarded him as disabled "given Talley's admission that he believed Mr. Holliday was not 'normal' based on his combat-connected PTSD."  (Doc. 61 at p. 17.)  This misrepresents Talley's testimony.  Talley did not testify that Holliday was not "normal" "based on his combat-connected PTSD." Rather, Agent Talley clarified his testimony that Holliday's *behavior* on the night of the incident was not "normal," a fact that Holliday's counsel agreed with and himself stated during Talley's deposition.  (Rec. doc. 52-16 at pp. 21-22).  Talley explicitly clarified in his deposition that he did not say that Holliday was not a "normal" person:  "I didn't say he

wasn't a normal person.  That – that was –  it wasn't normal behavior."  (*Id.* at p. 27).  In any event, the Court recognizes that Talley – as an hourly employee – was not the ultimate decisionmaker to terminate Holliday, as he himself acknowledged.  (Rec. doc. 61 at p. 23).

Holliday further maintains that Major Phil Barre "clearly regarded Mr. Holliday as disabled when he asked, three times during Mr. Holliday's review board hearing, for Mr. Holliday to guarantee the board that Mr. Holliday would never again suffer a PTSD flashback episode."  (Doc. 61 at p. 17.)   This Court finds that this statement also misrepresents the actual record. The DRB recording and transcript demonstrate that Barre's questions only occurred after Holliday himself voluntarily and unilaterally raised his PTSD diagnosis as his sole defense to the administrative charges against him, without ever being prompted by any OPSO official.  (Rec. doc. 51-4 at p.p. 4, 29-37).  Barre also did not ask Holliday to "guarantee" that he would never suffer another episode, as the transcript and recording demonstrate.  (*Id.*).  Holliday cannot assert his PTSD as his sole defense to the administrative charges brought against him by OPSO, but then object to OPSO officials asking him any questions about his PTSD.  Moreover, Barre's questions regarding Holliday's PTSD are not evidence that he regarded him as disabled.  *See O'Brien v. Walgreen Co.,* No. 3:09-CV-1053-L, 2010 WL 3446919 at *5 (N.D. Tex. Aug. 31, 2010) (holding that a plaintiff, who voluntarily submitted medical records indicating that his disability made him unqualified for his position, was not perceived as disabled by his employer merely because the employer requested additional medical testing from the plaintiff to confirm the nature of his ailment).

Lastly, Holliday also contends that Morreale, Disciplinary Board Chairman Craig McGehee, and members Louque and Chaz Ruiz all regarded him as disabled because they

testified at their depositions that either they believed Holliday when he testified at his DRB hearing that he has PTSD or they had no reason to dispute Holliday's testimony.  (Rec. doc. 70-1 at pp. 24-5; *id.* at p. 28; *id.* at p. 29; *id.* at p. 32).  But simply believing Holliday's testimony or having no reason to dispute it is not the same as regarding him as disabled for purposes of the ADA.  The Court finds Holliday's statements stretch too far the meaning of the four men's testimony.

Holliday's case of discrimination fails for another glaring reason as well.  In his motion for summary judgment, Holliday lists six other OPSO employees who he claims are similarly situated to him.  (Rec. doc. 52-1 at pp. 14-15).  These employees were also arrested, yet none of them was terminated.  The Fifth Circuit construes "very narrowly" the requirement that comparators be "similarly situated" as a "stringent standard."  *Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp. 3d 826, 843 (S.D. Tex. 2017) (citing *Montemayor v. Triumph Healthcare*, No. H–11–2436, 2013 WL 3229716 at *3 (S.D. Tex. June 25, 2013)).  The Fifth Circuit requires that an employee who proffers a fellow employee as a comparator must demonstrate that the employment actions at issue were taken "under nearly identical circumstances."  *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor, or had their employment status determined by the same person, and have essentially comparable violation histories.  *Id.*

None of these employees was a lieutenant like Holliday.  (Rec. doc. 52-1 at pp. 14-15).  They were recruits, civilians, and/or deputies.  (*Id.*).  Moreover, Holliday has produced no evidence that any of these other six employees had the same supervisor or

14

responsibilities as he.  Holliday fails to acknowledge that there were other hearings at which the same DRB members who recommended Holliday's termination served together on another employee-arrest case and at which they also voted to terminate that individual. (Rec. doc. 55-6 at p. 67).  Indeed, Holliday also fails to mention the other 13 employees of the OPSO who were terminated after arrest and had been charged with violations of Articles 201 and 301.  (*Id.* at ¶ 40).  For these reasons, Holliday's claim under the ADA fails.[3]

### B.     USERRA

The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, was enacted in 1994 as the first significant modification in protection of veterans' employment rights in 50 years.  *Bradberry v. Jefferson County, Tex.*, 732 F.3d 540, 544 (5th Cir. 2013) (citing "Veterans' Law Note," ARMY LAWYER 40 (Dec. 1994)). Almost eleven years after the enactment, the Department of Labor adopted regulations pursuant to its statutory authority.  38 U.S.C. § 4331(a); 20 C.F.R. §§ 1002.1-1002.314.

USERRA creates a comprehensive statutory scheme to provide civilian reemployment rights for those who serve in the armed forces in order "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." *Smith v. U.S. Postal Serv.*, 540 F.3d 1364, 1366 (Fed. Cir. 2008) (quoting 38 U.S.C. § 4301(a)). USERRA also aims "to minimize the disruption to the lives of persons performing service," and "to prohibit discrimination against persons because of their service."  *Id.* Section 4311 of USERRA generally prohibits employment discrimination and retaliation against a person

---

[3] Because this Court has found that Holliday failed to establish a *prima facie* case of discrimination, it need not reach whether the OPSO produced a legitimate, non-discriminatory reason for the adverse employment action or whether Holliday has established that that reason is a lie.

who served in a uniformed military service.  38 U.S.C. § 4311. Sections 4312 and 4313 generally provide rights of reemployment and benefits for a person who was required to be absent from employment for military service.  *Id.* §§ 4312, 4313.  Sections 4311 and 4312 provide distinct causes of action.  *Id.* §§ 4311, 4312.  *Bradberry*, 732 F.3d at 545 (citing *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 303 (4th Cir. 2006)).  The statute should be "liberally construed" for the protection and benefit of military service members. *Mayeaux v. Houston Indep. School Dist.*, 986 F.Supp.2d 842, 847 (S.D. Tex. Apr. 3, 2014) (citing *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980)).

Section 4311 provides that a servicemember "shall not be denied . . . retention in employment" because of the person's military service.  38 U.S.C. § 4311(a).  An employer will violate this prohibition when "membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor" in an employment decision.  38 U.S.C. § 4311(c)(1).

By referring to a "motivating factor," the statute does not textually suggest that military service be the sole factor.  *Mayeaux*, 986 F. Supp. 2d at 847 (citing *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002)("By requiring a plaintiff to show that his or her military service was a 'motivating factor' behind an adverse employment action, Congress replaced the Supreme Court's interpretation of USERRA's predecessor statute, under which an employee's military status was required to be 'the sole motivation for the employer's action.'").  A Department of Labor regulation states that a plaintiff "has the burden of proving that a status of activity protected by USERRA was one of the reasons" for the employer's decision.  20 C.F.R. § 1002.22.  The employer, though, is not liable under USERRA if it "can prove that the action would have been taken in the absence of such

membership, application for membership, service, application for service, or obligation for service."   38 U.S.C. § 4311(c)(1).   The regulation elaborates on this provision:   "If the individual succeeds in proving that the status or activity protected by USERRA was one of the reasons the employer took action against him or her, the employer has the burden to prove the affirmative defense that it would have taken the action anyway."   20 C.F.R. § 1002.22.

The circuit courts have been "unanimous in adopting the 'substantial or motivating factor' test, rather than the 'sole motivating factor' test."   *Mayeaux*, 986 F. Supp. 2d at 847 (citing *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 16 (1st Cir. 2007); *see also Gummo v. Vill. of Depew, N.Y.*, 75 F.3d 98, 106 (2nd Cir. 1996)).   Under this test, "military service is a motivating factor for an adverse employment action if the employer relied on, took into account, considered, or conditioned its decision on the employee's military-related absence or obligation."   *Mayeaux*, 986 F. Supp. 2d at 847 (citing *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1368 (Fed. Cir. 2009)).   If "one reason for the employer's actions was [an employee's] 'membership, service, application for service, or obligation for service in the uniformed services,' then that reason was a motivating factor."   *Bradberry*, 732 F.3d at 551.

If the plaintiff establishes that his or her military service was a motivating factor in her termination, the defendant may nonetheless "escape liability by showing by a preponderance of the evidence, as an affirmative defense, that it would have made the same decision" without regard to the plaintiff's military status.   *Mayeaux*, 986 F. Supp. 2d at 848 (citing *Robinson v. Morris Moore Chevrolet-Buick, Inc.*, 974 F. Supp. 571, 576 (E.D. Tex. 1997); *see* 38 U.S.C. § 4311(c)(1) (placing burden on employer to prove that action would

have been taken in absence of military status).  Therefore, in contrast with Title VII cases analyzed under the *McDonnell Douglas* framework in which the burden remains on the plaintiff to show pretext, in USERRA cases "the burden [is] on the employer to show lack of pretext." *Mayeaux*, 986 F. Supp. 2d at 848 (citing *Velazquez-Garcia*, 473 F.3d at 16). "Obtaining judgment as a matter of law on this type of affirmative defense is an 'uphill climb' for [the defendant if the plaintiff] can demonstrate that a jury could find that [his or] her military absences were a motivating factor in [his or] her termination." *Mayeaux*, 986 F. Supp. 2d at 848 (citing *De La Garza v. Brumby*, Civ. A. No. 6:11-CV-37, 2013 WL 754260 at *6 (S.D. Tex. Feb. 27, 2013)).  "Once a plaintiff makes that showing, a defendant can only succeed at the summary judgment stage by showing that the same jury that could find military [service] were a motivating factor would have to find that such [service] was not the motivating factor." *Mayeaux*, 986 F. Supp. 2d at 848; *Cain v. Exxon Mobil Corp.*, 400 F. Supp. 3d 514, 524–26 (M.D. La. 2019).

Holliday's claim under USERRA fails because he has no proof that his termination was motivated by discriminatory animus based on his prior military service.  Rather, he claims that his termination was based on his PTSD which is "related to his prior, active-duty combat service in the United States Marine Corps."  (Rec. doc. 42 at ¶ 141).  However, a plaintiff who only alleges that he was discriminated against because of a disability caused by his military service has failed to state a claim under USERRA.  *See, e.g., Felton v. City of Jackson*, No. 3:18CV74TSL-RHW, 2018 WL 2994363 at *4 (S.D. Miss. June 14, 2018) (holding that plaintiff with PTSD caused by military service did not successfully assert a claim under the statute because the plaintiff did not allege that he was discriminated

against because of his previous military service, and instead, only alleged that he was discriminated against because of his PTSD).

To infer discrimination under USERRA, courts consider four factors, namely the proximity in time between the plaintiff's military service and the adverse employment action; whether the defendant's proffered reason for termination is consistent with the defendant's actions; whether the defendant was hostile toward the military; and any disparate treatment between military and nonmilitary employees. *Gill v. Petroleum Co-Ordinators, Inc.*, No. 6:14-CV-02869, 2016 WL 4574169 at *4 (W.D. La. Aug. 31, 2016). Here, Holliday was honorably discharged from the military in 2003, approximately 15 years before the OPSO terminated him.

Moreover, Holliday testified that at only two times at the OPSO did he feel discriminated against because of his military service. As an example, Major Louque – a member of Holliday's hearing board – called him a "jar head" and a "dumbass marine." (Rec. doc. 55-7 at pp. 17-18). He also testified, however, that he knew Louque was not "going after" him and that he was unaware of Louque ever taking adverse employment action against anyone at the OPSO because of their military service. (*Id.* at p. 18). Louque also served in the Army for three years, is proud of his military service, and considers himself a supporter of military veterans, particularly those veterans – like Holliday – who were in combat. (Rec. doc. 55-9 at p. 3). But "garden-variety complaints about minor slights and disagreements with supervisors . . . are not protected by USERRA. A federal court does not sit as a super-personnel department that oversees a company's general employment practices and guarantees to each employee a genial boss." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 722 (8th Cir. 2011).

Moreover, the ultimate decisionmaker, Director Hodge, was in the U.S. Army from 1971-1974 and served combat duty in Vietnam as a green beret.  (Rec. doc. 55-3 at ¶ 16).  Director Hodge is proud of his military service and proud of those other individuals who have performed military service.  (*Id.*).  Given Director Hodge's military background, he has never held an employee's military service against him, including Holliday, when deciding on discipline.  (*Id.*).  Holliday himself testified that he did not believe Director Hodge had any animus against him because of his PTSD based on Director Hodge's earlier military service.  (Rec. doc. 55-2 at ¶ 88).  USERRA protects employees only from discriminatory animus by the ultimate decisionmaker, and given the evidence related to Director Hodge, the Court finds that Holliday cannot establish such a fact.  *Lisdahl*, 633 F.3d at 722 ("Because the "retaliations" claimed by Amendola and Swor were not materially adverse employment actions, the district court did not err in granting Gold Cross and Johnson's motion for summary judgment.").  The actions of Louque – who had no ultimate authority over Holliday's employment – are even less significant and do not constitute adverse employment action. *See id.*

Holliday has made no showing that any individuals who did not serve in the military were treated more favorably than him or anyone else who served in the military.  Nor could he, as the OPSO has terminated several other employees who have been arrested who  have no known prior military service.  (Rec. doc. 55-2 at ¶¶ 90-91).  As such, Holliday cannot demonstrate that his military service was a motivating factor for his termination.  For these reasons, Holliday's claim under USERRA fails as a matter of law.

## C.     Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment on Liability (rec. doc. 52) is **DENIED** and Defendant's Motion for Summary Judgment (rec. doc. 55) is **GRANTED**.

New Orleans, Louisiana, this 18th day of _____ November _____, 2021.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE